IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GLADYS ADJEI-POKU,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>THE UNIVERSITY OF UTAH,<br><br>　　　　Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:18-cv-00106-DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant the University of Utah's Motion for Summary Judgment. The court held a hearing on the motion on November 19, 2019. At the hearing, Defendant was represented by Adam S. Kunz, and Plaintiff was represented by Mary J. Woodhead. The court took the matter under advisement. The court considered carefully the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court issues the following Memorandum Decision and Order.

## BACKGROUND

Plaintiff Gladys Adjei-Poku ("Adjei-Poku") is a Ghanaian immigrant and a nurse who has been employed by the University of Utah hospital since 1995. The University of Utah (the "University") is a public institution of higher education and a subdivision of the State of Utah. Over the course of her career, Adjei-Poku has risen from a clinical nurse to a nurse director, and she is currently a nurse manager.

In 2012, Adjei-Poku's supervisor, Jeremy Fotheringham ("Fotheringham") promoted her to become the new Associate Director of Cardiovascular Medicine ("CVMU"), AirMed, and

Endoscopy services. After Fotheringham left in 2013, Laura Adams ("Adams") became Adjei-Poku's supervisor for a short time period. During that time, Adams asked Adjei-Poku to assist at the Midvale Clinic, a volunteer clinic with low income patients, along with her other duties. Although she was aware that the position at the Midvale Clinic could potentially expand in the future, Adjei-Poku initially spent only a few hours working there each week. Adams was impressed with Adjei-Poku's work performance at the Midvale Clinic along with her other duties. Specifically, Adams praised Adjei-Poku for being a role model in the Cultural Diversity Program, a program that the University was implementing, and for her outstanding contributions to cultural diversity more generally.

Beginning in late 2013, Margaret Pearce ("Pearce"), the Chief Nursing Officer of the University of Utah Health Department, began a significant restructuring of the nursing department. As a part of that process, Pearce asked Tracey Nixon ("Nixon"), the Director of Capacity Management and Cardiovascular Services, to expand the cardiovascular services unit. Importantly, the restructuring involved CVMU. Because Adjei-Poku was the Associate Director of CVMU, the reorganization eventually resulted in a change to her chain of command. Instead of continuing to report to Adams, Adjei-Poku now reported to Nixon. In her initial assessment of Adjei-Poku, Nixon recognized that she was fairly new in her position as the Associate Director, and she felt that Adjei-Poku was struggling to make the transition from the role as a nurse manager to that of an associate director. Although she noted various areas where Adjei-Poku was excelling, she further acknowledged some areas in which she and Pearce determined that Adjei-Poku could improve. Based on her assessment, Nixon directed Adjei-Poku to take a step back and run everything through her.

Over the course of the restructuring process, other departments were added to the services that Nixon was over. These departments included PICC, Wound, and Ostomy; a new cardiovascular intensive care unit; the interventional labs; and preventative cardiology. With the addition of these new departments, Nixon continued to note what she perceived to be inadequacies in Adjei-Poku's skillset as an associate director. Specifically, Nixon felt that Adjei-Poku struggled to work with teams and displayed an inability to manage the complex political relationships that were required of an associate director. Accordingly, after more than a year of working with Adjei-Poku, in late 2015, Nixon determined that CVMU "need[ed] a new face" and that Adjei-Poku should no longer be an associate director over CVMU as a whole, but should have charge over the smaller PICC, Wound, and Ostomy services.

In December 2015, Nixon met with Adjei-Poku to discuss her job reassignment. After the meeting, Nixon clarified to Adjei-Poku through an email exchange that Nixon would be shifting responsibilities based on certain business needs, but that Adjei-Poku would continue to support PICC, Wound, and Ostomy; the Office of Diversity; and the Midvale Clinic. Despite this alteration to her responsibilities, Nixon confirmed that Adjei-Poku was not changing positions and so would not receive a title change. However, Adjei-Poku was uncomfortable with the shift in her responsibilities and believed that Nixon may be discriminating against her. Accordingly, on December 29, Adjei-Poku went to the University's Office of Equal Opportunity and Affirmative Action (the "OEO") to meet with investigator Brian Nicholls ("Nicholls") to consider her options for filing a complaint with the OEO. During that meeting, Nicholls explained to Adjei-Poku that she could not successfully raise a discrimination complaint without legally sustainable proof. Because Adjei-Poku felt that she lacked such proof, she decided

against moving forward with a complaint at that time. Nevertheless, Nicholls provided Adjei-Poku with the appropriate paperwork in case she decided to file a complaint at later date.

As a matter of standard practice, following Nicholls' meeting with Adjei-Poku, he neither instituted an investigation nor notified Pearce, Nixon, or anyone else outside the OEO about the meeting. It is only under exceptional circumstances, which Nicholls determined were not present, that anyone outside the OEO is notified about a potential complaint before the actual complaint is filed.

In January 2016, Nixon sent an email to various individuals in her department with information regarding department changes. She stated that, moving forward, Adjei-Poku's responsibilities would be limited to PICC, Wound, and Ostomy. She also explained that Adjei-Poku would serve as a nursing liaison to the diversity committee within the University hospital system, and that such changes would be effective January 18. In addition, she explained that two other employees' roles would change.

At some point during January, Adjei-Poku hand-delivered a memorandum to Nixon wherein she raised concerns about racial stereotyping, her diminishing work responsibilities, losing her job, and her diversity role. Furthermore, she arranged a meeting with Pearce to share her concerns about Nixon. This meeting was a result of communications between Adjei-Poku and Quinn McKenna ("McKenna"), the Utah Hospital Chief Operating Officer, in which she had told McKenna that she believed she was being discriminated against. In her meeting with Pearce, Adjei-Poku expressed her unhappiness and difficulties in working with Nixon but explained that she desired to remain in charge of PICC, Wound, and Ostomy. Pearce responded that if Adjei-Poku wanted to continue working in those areas, she would need to learn to work with Nixon given that Nixon was over those services. Pearce also told Adjei-Poku that, given

her dissatisfaction with her current situation, there was an opportunity to take a newly-expanded role as the Director of Diversity. While the position was new and would need to be approved through the appropriate channels, Pearce felt that Adjei-Poku would be the ideal candidate if she were interested. Adjei-Poku seemed to embrace the suggestion with enthusiasm.

Given that Nixon had informed Adjei-Poku that her new roles would commence on January 18, 2016, and her conversation with Pearce regarding the Director of Diversity position, Adjei-Poku showed up at the Midvale Clinic on January 18 to begin her new diversity role. However, when she arrived, the Diversity MD, Dr. Gopez, had not known she was coming. After speaking with Dr. Gopez, Adjei-Poku followed up with Pearce who informed her that the University had not yet created the Director of Diversity position. As such, the purported role had neither a budget nor a position description, but Pearce asked Dr. Gopez and Adjei-Poku to assist in creating them. Despite the uncertainty regarding the specifics of her new position, Adjei-Poku retained the same salary, benefits, hours of work, office, and title as an associate director.

Over the next several months, Adjei-Poku had various meetings and communications with Nixon, Pearce, and Dr. Gopez regarding the details of Adjei-Poku's diversity position. By April, Adjei-Poku began reporting directly to Dr. Gopez and ceased reporting to Nixon. Yet, Adjei-Poku began to feel stronger that her reassignment to the diversity position was a result of discrimination. Accordingly, at some point in time, she went to speak with Dr. Cohen, the University Ombudsman, to explain her situation. In turn, Dr. Cohen directed her to the OEO, but she explained that she had already been there. After that, she went to the Attorney General's office and sought further guidance regarding her rights, and she began actively looking for another job. Then, in June, she filed a charge of discrimination with the Utah Labor Commission claiming that Nixon had discriminated and retaliated against her based on her race and national

origin.  Around that time period, Pearce was contacted by the Utah Adjudication and Labor

Division ("UALD") to provide a witness statement regarding Adjei-Poku's claim of

discrimination.  Pearce claims that this was the first time she became aware that Adjei-Poku felt

that Nixon was discriminating against her.  Eventually, Adjei-Poku accepted a new job as a nurse

manager in endocrinology, and following her departure, the diversity position ceased to exist.

Adjei-Poku filed the instant suit on October 31, 2017 in Utah state court.  In February

2018, the University removed the case to this court.  In her complaint, Adjei-Poku raises claims

of discrimination and retaliation based on race and national origin in violation of Title VII of the

Civil Rights Act of 1964.  More specifically, she contends that Nixon discriminated against her

by (1) eroding her work-related authority; (2) diminishing the scope and responsibilities of her

work; (3) humiliating her in staff meetings by saying that people could not understand her

because of her accent[1]; (4) mocking her accent; (5) moving her to a non-existent position in

diversity in which she had no previous experience; (6) removing her from her nursing duties

despite her exemplary performance; and (7) transferring her job responsibilities to white women

with less experience. Moreover, Adjei-Poku contends that her transfer to the non-existent

diversity position was done in retaliation for her complaints about Nixon.

## DISCUSSION

The University now moves for summary judgment on both of Adjei-Poku's causes of

action.  "Summary judgment is appropriate if the movant 'shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Roberts v.

Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018) (quoting Fed. R. Civ.

---

[1] As an exhibit, Adjei-Poku includes a communication to her from a coworker wherein the coworker stated that she thought Nixon had treated Adjei-Poku poorly in a staff meeting.  Although the coworker opines that Nixon's conduct was unprofessional, she does not suggest that any of Nixon's actions were racially motivated.

6

P. 56(a)). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citation omitted). In applying this standard, the court must "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quoting *Ribeau v. Katt*, 681 F.3d 1190, 1194 (10th Cir. 2012)). Accordingly, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the movant's motion must be denied. *Roberts*, 884 F.3d at 972 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## I. Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When filing suit under Title VII based on allegations of such discrimination, an employee can establish his or her claim by producing either direct or circumstantial evidence of discrimination. *Stover v. Martinez*, 382 F.3d 1064, 1075 (10th Cir. 2004).

### A. Direct Evidence

In Title VII cases, evidence of discrimination is only considered direct evidence "if it 'proves the existence of a fact in issue without inference or presumption.'" *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)). Generally, a plaintiff will prove discrimination by direct evidence by presenting "proof of 'an existing policy which itself constitutes

7

discrimination.'" *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996) (quoting *Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990)). But, even absent a discriminatory policy, discriminatory comments in the workplace may constitute direct evidence if the plaintiff "shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). That said, workplace comments that reflect personal bias or personal opinions do not qualify as direct evidence of discrimination. *Id.* Moreover, discriminatory statements do not qualify as direct evidence if (1) "the context or timing of the statements is not closely linked to the adverse decision," or (2) "the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign." *Id.* Regardless of the evidence that a plaintiff produces, for it to qualify as direct evidence, it must demonstrate "on its face that the employment decision was reached for discriminatory reasons." *Fassbender*, 890 F.3d at 883 (quoting *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)).

In this case, Adjei-Poku does not contend that the University had a discriminatory policy. Rather, she claims that Nixon mocked her accent on various occasions, which, she avers, constitutes direct evidence of discrimination. The evidence that Adjei-Poku produced in support of this claim is contained in her deposition testimony. There, Adjei-Poku claimed that, on various occasions, Nixon made comments such as: "I don't understand what you're saying, but go on." App. to Def.'s Mot. for Summ. J., Ex. C at 41. Additionally, towards the end of the deposition, Adjei-Poku testified: "And if [Nixon] at any time with me and her, the two women in her office, would tell anybody that she did not mock my accent and the way I speak, then birds don't fly. She did." *Id.* at 80. Adjei-Poku claims that this stands as direct evidence of

8

discrimination that led to Nixon whittling away Adjei-Poku's responsibilities and her eventual reassignment to work in diversity.

Preliminarily, the court notes that as Adjei-Poku's supervisor, Nixon had decision-making authority over her. Thus, for Adjei-Poku's evidence to be direct evidence, the court must determine whether it demonstrates that Nixon acted on her alleged discriminatory beliefs. The court concludes that it does not. First, Nixon's comments about her difficulty in understanding Adjei-Poku can plausibly be interpreted as being non-discriminatory. It is entirely reasonable to believe that Nixon truly struggled to understand Adjei-Poku's speech. This is further supported by the fact that the specific comments that Adjei-Poku highlights lacked any facially discriminatory remarks. Second, regarding Adjei-Poku's more general testimony that Nixon ridiculed her accent, that evidence does not demonstrate on its face that Nixon reassigned Adjei-Poku for discriminatory reasons. The court acknowledges that the comments may *suggest* that Nixon acted based on racial animus, but for the court to reach that conclusion, it would be required to take an inferential step. Therefore, because the court cannot determine, based on Adjei-Poku's testimony, that Nixon reassigned Adjei-Poku for discriminatory reasons without relying on inference or presumption, the court concludes that Adjei-Poku's testimony does not qualify as direct evidence of discrimination.

### B. Indirect Evidence

In cases lacking direct evidence of discrimination, courts in the Tenth Circuit apply the three-part, burden-shifting framework outlined in the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). Under the so-called "*McDonnell Douglas* framework," a plaintiff must first establish a prima facie case of discrimination by demonstrating "that (1) [he or she] is a member

of a protected class, (2) [he or she] suffered an adverse employment action, (3) [he or she] qualified for the position at issue, and (4) [he or she] was treated less favorably than others not in the protected class." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). In addition to these four elements, "[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Barlow*, 703 F.3d at 505 (quoting *Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005)).

Once the plaintiff has established a prima facie case, "the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 603 (10th Cir. 2019) (unpublished) (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer can make this showing, "the burden shifts back to the employee to show the justification offered by the employer was pretextual." *Id.* To demonstrate that the employer's proposed justification constitutes pretext, the plaintiff must "show[] that the employer's proffered explanation is unworthy of credence." *Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005); *see also Lobato v. New Mexico Env't Dep't*, 733 F.3d 1283, 1289 (10th Cir. 2013) ("Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."). In other words, the plaintiff "must call into question the honesty or good faith of the [employer's] assessment of his [or her] abilities." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004). It is simply not enough "that a factfinder could disagree with the employer's assessments." *Id.* at 1138.

Moreover, "[t]he relevant inquiry is not whether [the defendant's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs." *Id.* (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

In this case, the University does not dispute that Adjei-Poku is a member of a protected class. Additionally, the University failed to specifically address whether Adjei-Poku was qualified for her position as an associate director. Nevertheless, drawing all reasonable inferences in Adjei-Poku's favor and based on the fact that she maintained the title and pay of an associate director following her reassignment, the court will assume that Adjei-Poku has established this element. As for the reaming two elements, the University argues that Adjei-Poku has failed to meet her burden of establishing them.

The University contends that Adjei-Poku did not suffer an adverse employment action. The Tenth Circuit has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032– 33 (10th Cir. 2004)). "[M]ere inconvenience[s] or an alteration of job responsibilities," however, do not constitute adverse employment actions for purposes of a discrimination claim under Title VII. *Id.* (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 532 (10th Cir. 1998)). Here, the University contends that Adjei-Poku suffered no adverse action because (1) she suffered no change in pay, benefits, or title; (2) although her responsibilities changed, so did those of other employees; and (3) Adjei-Poku voluntarily accepted the diversity position.

11

Despite the University's contentions, the court concludes that Adjei-Poku has established that she suffered an adverse employment action. First, while it is true that Adjei-Poku suffered no change in pay, benefits, or title, she was reassigned to a diversity position that involved significantly different responsibilities. Indeed, Adjei-Poku went from performing her duties as a medically-trained professional, to doing clerical-type work akin to an administrative assistant in a field in which she had no previous experience or formal training. Moreover, when Adjei-Poku accepted the diversity position, it lacked a job description, job duties, an office, an administrative structure, and a budget, and it had not yet been formally approved by the University. In other words, Adjei-Poku's purported new position did not actually exist when she accepted it. Second, although the responsibilities of other employees changed with the reorganization, those employees were not reassigned to positions that involved significantly different responsibilities—at least not to the same extent as Adjei-Poku. Third, although Adjei-Poku voluntarily accepted the diversity position when Pearce offered it, before Pearce ever made that offer, Nixon had already communicated to Adjei-Poku that she would be reassigned to work as the Nursing Diversity Liaison. Thus, even though Adjei-Poku accepted Pearce's offer, Adjei-Poku was already under the impression that her responsibilities would be diverted to work in diversity—a change in her position that she had neither anticipated nor sought after. Therefore, the court is unpersuaded by the University's arguments and concludes that Adjei-Poku suffered an adverse employment action.

The court is also persuaded that Adjei-Poku has produced sufficient evidence to show that she was treated less favorably than others not in her protected class. Importantly, as the only black member of the nursing management team, Adjei-Poku was the only person that suffered a significant alteration to her job responsibilities due to the reorganization. Additionally, in her

deposition, Adjei-Poku testified that (1) all of the responsibilities that Nixon took from her were reassigned to white co-workers; (2) Nixon treated her poorly in work meetings (which was corroborated by a co-worker for at least one meeting); (3) Nixon easily became irritated with her; (4) Nixon told her the department "need[ed] a new face"; and (5) Nixon did not work with her to help her correct her purported faults. Based on this evidence, the court concludes that Adjei-Poku has established the fourth element of her claim, or at least provided sufficient evidence to create a genuine issue of material fact. Furthermore, when viewing the circumstances of Adjei-Poku's reassignment, the court is persuaded, at this stage of the litigation, that Adjei-Poku has produced enough evidence to support an inference of unlawful discrimination. Accordingly, the court concludes that Adjei-Poku has established a prima facia case of discrimination under Title VII.

Because Adjei-Poku has established a prima facie case, the burden shifts to the University to articulate a legitimate, nondiscriminatory reason for Adjei-Poku's reassignment. Notably, when providing a legitimate reason for its actions, an employer need not "litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)). Instead, an employer "need only 'explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.'" *Id.* (quoting *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000)). The University suggests Adjei-Poku's reassignment was based on the University's business needs as well as Nixon's evaluations of Adjei-Poku's strengths, weaknesses, and skillset. To support this assertion, the University points to (1) the fact that Nixon evaluated and worked with Adjei-Poku for over a year before

13

reassigning her, and (2) Adjei-Poku's employee evaluations from previous supervisors. The University claims that the long period of time in which Nixon evaluated Adjei-Poku before making any reassignments is strong evidence that Nixon acted strictly based on Adjei-Poku's skillset. The University also claims that Nixon's formal evaluations of Adjei-Poku were consistent with evaluations done by Adjei-Poku's previous supervisors.[2] Significantly, previous evaluations recognized Adjei-Poku's commitment to diversity. Therefore, bearing in mind that the University's burden is essentially one of production, the court concludes that the University has proffered legitimate, nondiscriminatory reasons for Adjei-Poku's reassignment.

Given that the University has articulated legitimate reasons for Nixon's actions, the burden shifts back to Adjei-Poku to demonstrate that such reasons constitute pretext. Adjei-Poku avers that the University's proffered reasons are pretextual because Adjei-Poku was the only person transferred outside of the nursing department; she was the only employee transferred to a significantly different position; and she was placed in a diversity position as the only black member of the nursing management team. On this point, the court concludes that there remain genuine issues of material fact precluding summary judgment. For example, although Nixon observed Adjei-Poku for more than a year before making any reassignments, in light of Adjei-Poku's testimony that Nixon claimed that she could not understand her and continuously mocked her accent, a reasonable factfinder could rationally infer that Nixon reassigned her for discriminatory reasons. Similarly, that Adjei-Poku was the only black member of the nursing management team and the only employee to be partially moved out of nursing into a diversity position, may cause a factfinder to deduce that the reassignment was done for discriminatory

---

[2] It is noteworthy that the evaluations by previous supervisors are consistent with Nixon's in that they suggested that Adjei-Poku had areas of improvement, but they were not necessarily the same areas of improvement that Nixon perceived.

14

purposes. In sum, the court is persuaded that Adjei-Poku has provided enough evidence to create a genuine issue of material regarding pretext such that her claims should be heard by the finder of fact at trial. Accordingly, the University's motion must be denied.

## II. Retaliation

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C § 2000e-3(a). "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden" in either of two ways: (1) the "mixed-motive" theory; or (2) the *McDonnell Douglas* framework. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224–25 (10th Cir. 2008).

### A. Mixed-Motive Theory

Under the mixed-motive theory, the plaintiff must "present[] evidence that directly shows that retaliation played a motivating part in the employment decision at issue." *Id.* at 1226. To do this, the plaintiff must "demonstrate that the alleged retaliatory motive actually relate[s] to the question of discrimination in the *particular* employment decision . . . through the production of either direct or circumstantial evidence." *Id.* (internal quotation marks omitted) (emphasis and alteration in original). Put differently, "the plaintiff must 'present[ ] evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'" *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 (10th Cir. 2011) (quoting *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997)). If the plaintiff can meet this burden and prove that "retaliatory animus was a motivating factor, the burden . . . shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive." *Fye*, 516 F.3d at 1226.

15

In this case, Adjei-Poku has failed to produce evidence directly demonstrating that retaliation played a motivating part in her reassignment. While she points to Nixon's alleged comments mocking her accent as being direct evidence of discrimination, this evidence does not directly reflect a retaliatory motive or attitude. Consequently, for Adjei-Poku's retaliation claim to survive the University's motion, she must rely on the *McDonnell Douglas* framework.

### B. *McDonnell Douglas* Framework

If a plaintiff cannot "directly establish that retaliation played a motivating part in the employment decision at issue," he or she may instead rely on the *McDonnell Douglas* framework. *Id.* at 1225. Under this framework, a plaintiff must first establish a prima facie case of retaliation by providing evidence of the following three elements: "(1) [the plaintiff] engaged in protected opposition to Title VII discrimination; (2) [the plaintiff] suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Id.* at 1227 (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004)). For retaliation claims, an adverse employment action "is something that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Lincoln v. Maketa*, 880 F.3d 533, 540 (10th Cir. 2018) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). For the third element, a plaintiff must establish a causal connection by presenting "evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)). Significantly, when the "protected conduct is closely followed by the adverse action, courts have often inferred a causal connection." *Id.*; *see also Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013) ("[I]f the

adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference.").

Again, once a plaintiff has established the prima facie elements of his or her retaliation claim, the burden then shifts to the employer to "proffer a legitimate, nondiscriminatory reason" for the adverse employment action. *Fye*, 516 F.3d at 1228. Importantly, "[e]stablishing a legitimate, nondiscriminatory reason is a burden of production and can involve no credibility assessment." *Id.* (quotation marks omitted). Once the employer has provided a legitimate, nondiscriminatory reason for its actions, the burden shifts back to the plaintiff who must then demonstrate that the employer's "proffered explanation is a pretext for retaliation." *Id.* A plaintiff can establish pretext for a retaliation claim in the same way a plaintiff can do so for a discrimination claim—that is, by "produc[ing] evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* Notably, unlike the third element of a plaintiff's prima facie case, pretext *cannot* be established based solely on temporal proximity. *See Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004). Instead, courts impose a "more demanding" burden that "requires a plaintiff to assume 'the normal burden of any plaintiff to prove his or her case at trial.'" *Id.* (quoting *Flasher*, 986 F.2d at 1316).

Here, the University concedes that Adjei-Poku can satisfy the first element of her claim in that her discussions with various University employees and her charge of discrimination all constituted protected activity. Nevertheless, the University contends that Adjei-Poku has failed to meet the second and third elements of her claim. Because the court concludes that the third element is dispositive of Adjei-Poku's retaliation claim, the court will assume without deciding,

17

that Adjei-Poku's reassignment to the diversity position constituted an adverse employment action.[3]

As stated above, for Adjei-Poku to establish a prima facie case for retaliation under Title VII, she must demonstrate "a causal connection between the protected activity and the adverse employment action." *Fye*, 516 F.3d at 1227. The first time that Adjei-Poku raised concerns about discrimination and engaged in protected activity was on December 29, 2015 when she met with Nicholls. However, Nixon was already making preparations to alter Adjei-Poku's responsibilities *before* Adjei-Poku ever met with Nicholls as indicated by an email exchange between Nixon and Adjei-Poku on December 11 and 18. In that exchange, Adjei-Poku and Nixon referenced a December 8 conversation where they had discussed the alteration of Adjei-Poku's job responsibilities. In the December 8 conversation, Nixon explained that Adjei-Poku's role would change and that she would only have responsibilities over PICC, Wound, and Ostomy; the Midvale Clinic; and diversity. Thus, based on this timeline, there could have been no causal connection between Ajdei-Poku's protected activity and her reassignment. Accordingly, Adjei-Poku's retaliation claim must be dismissed.

## CONCLUSION

Based on the foregoing reasoning the University's Motion for Summary Judgment is hereby GRANTED in part and DENIED in part. The motion is GRANTED as to Adjei-Poku's retaliation claim but DENIED as to Adjei-poku's discrimination claim.

---

[3] Adjei-Poku also argues that after she complained about the alleged discrimination to various individuals, her supervisors ceased making any effort to support the diversity position. Adjei-Poku contends that this too constitutes an adverse employment action. The University, however, has provided sufficient evidence to rebut this contention. *See* App. to Def.'s Mot. for Summ. J., Ex. N. Specifically, the University produced emails between Pearce, Adjei-Poku, and Dr. Gopez discussing important aspects of the diversity position in April 2016, months after Adjei-Poku had started in the role. Based on this evidence, the court concludes that Adjei-Poku did not suffer an adverse employment action by her supervisors' alleged failure to continue supporting the diversity role.

Dated this 6th day of December, 2019.

BY THE COURT:

*Dale A. Kimball*
DALE A. KIMBALL
United States District Judge